IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 15-0416 WHA |
| Plaintiff, | |
| v. | **ORDER RE RULE 29 AND RULE 33 MOTIONS** |
| ENZO CESTONI, | |
| Defendant. | |

## INTRODUCTION

A jury convicted defendant of two counts of being an illegal alien in possession of a firearm in violation of 18 U.S.C. 922(g). Now, defendant moves for a judgment of acquittal under Rule 29 on one count and for a new trial under Rule 33 on the other count. To the extent stated herein, defendant's Rule 29 motion is **GRANTED IN PART** and defendant's Rule 33 motion is **GRANTED IN FULL**.

## STATEMENT

After a three-day trial, a jury convicted defendant Enzo Cestoni on two counts of being an alien in possession of a firearm. The factual background of the case is as follows. On the night of July 7, 2015, Victim Derek Peralta was at Blondie's Bar in San Francisco with three friends. Shortly after arriving, he walked to the bathroom in the back of the bar. While in the bathroom, he was physically assaulted by two men, one of whom had long hair. After the assault, Peralta left the bathroom and walked back to his friends, who were sitting at the bar.

Peralta told his friends what had happened in the bathroom and showed them the bloody wounds on his face. Shortly thereafter, Peralta and his friend, Jose Cruz, left the bar, walked onto the sidewalk, and Peralta saw one of the men who had assaulted him. Peralta confronted the man and asked why he had been the victim of this seemingly random assault. In response, the man displayed a black firearm in his waistband (April 5 Tr. at 24–42).

Victim Peralta walked away from the man with the gun and flagged down a police car. He told the officers that he had been assaulted by two men, one of whom had a gun. He then pointed the police to the two men, who were still on the sidewalk outside the bar (but separated from each other), each accompanied by a female companion. The officers soon detained all four people (the two men and their two female companions). The two men were Enzo Cestoni and Claudio Maciel. The two women were Selena Lennox (who was with Maciel) and Nancy Sanchez (who was with Cestoni). Shortly after encountering the four people, police found a loaded .38 caliber Smith & Wesson revolver in Lennox's purse. All four went to Mission Police Station. There, during a cold show conducted while he was in an ambulance, Victim Peralta identified Cestoni as the man who had displayed the firearm outside Blondie's Bar. The next day, in a phone call with police, Peralta confirmed that the man with the long hair (Cestoni) had the firearm outside the bar (Maciel had short hair) (April 5 Tr. at 105–22; 185–90).

In August 2015, the grand jury returned an indictment charging Cestoni with being an illegal alien in possession of a firearm and charging Maciel with being a felon in possession of a firearm, charging both with possessing the same gun (Dkt. No. 1). In February 2016, Maciel pled guilty to the charge against him.

In March of 2016, twelve days before Cestoni's trial date, the grand jury returned a superseding indictment, adding a second alien in possession charge against Cestoni. The new charge (Count One) was based on a photograph that had been posted to Cestoni's Instagram account on July 4, 2015 — three days before the incident at Blondie's. The charged photograph depicted a person's hand, with a distinctive red star tattoo, resting on a table next to a box of Winchester ammunition and a firearm that appeared to be the firearm recovered from Selena

2

1  Lennox's purse on July 7 (as well as a black Luger).  Other photographs from the Instagram
2  account showed that Cestoni has a distinctive red-star tattoo on his hand that is identical to the
3  tattoo depicted in the photograph with the firearms.
4        After a three-day trial, a jury convicted Cestoni on both counts — Count One relating to
5  the Instagram photograph posted on July 4 and Count Two relating to the firearm incident
6  outside Blondie's Bar on July 7.  Now, Cestoni moves for a judgment of acquittal under Rule 29
7  on Count One, and moves for a new trial under Rule 33 on Count Two.  This order follows full
8  briefing and oral argument.

### ANALYSIS

**1.    RULE 29 MOTION.**

Rule 29(c) provides that a defendant may move for a judgment of acquittal, or renew such a motion, after a guilty verdict or after the court discharges the jury.  The standard for deciding a motion under Rule 29(c) is well-settled: "The evidence is sufficient to support a conviction if, reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vgeri*, 51 F.3d 876, 879 (9th Cir. 1995) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  The "evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case." *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc).

      Cestoni argues that, in regards to Count One, no rational trier of fact could have found that the government proved, by a preponderance of the evidence, that venue was proper in the Northern District of California.  This order agrees.  Rule 18 provides that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."  "Proper venue is not a mere technicality.  Instead, a defendant in a criminal case has a constitutional right to be tried in a district where the crime was committed." *United States v. Lukashov*, 694 F.3d. 1107, 1119 (9th Cir. 2012).

      Here, the government argues that three items of evidence, presented during trial, would enable a rational trier of fact to find that proper venue had been satisfied.  *First*, the government

1  points to the fact that Cestoni was at Blondie's Bar, in San Francisco, on July 7, three days after
2  the photograph with the gun had been posted to Cestoni's Instagram account. Basic logic
3  dictates that simply because a person is in a given city on one day, it does not follow that an
4  Instagram photo, posted three days before the person had been in that given city, was taken in
5  that same city, much less that he was in that city on the date the photograph was earlier taken —
6  here an unknown date. The photograph could just as easily have been taken outside our district
7  as within it. (No trial evidence even established where Cestoni resided.)

8  Our court of appeals has clearly held that "evidence is insufficient to support a verdict
9  where mere speculation, rather than reasonable inference, supports the government's case."
10 *Nevils*, 598 F.3d at 1167. The inference that a photograph was taken in a certain location,
11 simply because the person depicted in the photograph had been in that location three days after
12 the photograph was eventually posted to Instagram, is simply not reasonable. This is exactly
13 the type of speculation our court of appeals warned against in *Nevils*.

14 *Second*, the government argues that the photograph posted to Instagram on July 4 must
15 have been taken in the Northern District because on July 7, Cestoni had been hanging out with
16 one person who wore a San Francisco 49ers hat and another person who wore a Golden State
17 Warriors sweatshirt. The absurdity of this argument hardly needs to be addressed. The
18 government does not assert that Cestoni himself wore Bay Area sports attire, but only that the
19 people he happened to be with on July 7 wore Bay Area sports attire while they were in the Bay
20 Area. The government essentially argues a rational trier of fact could make the inference that
21 Cestoni lived in the Bay Area, and thus the photograph posted to Instagram on July 4 was taken
22 in the Northern District, because Cestoni associated on one night with people who wore Bay
23 Area sports attire. This is not reasonable inference — this is utter speculation.

24 *Third*, the government argues that Cestoni's ties to San Francisco were demonstrated by
25 "a photograph of a note posted on defendant's Instagram account on April 8, 2014, to excuse
26 the person to attend the San Francisco Giants home opener" (Opp. at 2). Essentially, the
27 government argues a rational trier of fact could draw the inference that because Cestoni went to
28 a San Francisco Giants game in April 2014, a photograph of Cestoni posted to Instagram in July

4

2015 (more than a year later) must have also been taken in San Francisco. Once again, this is not reasonable inference. It is nothing more than pure speculation.

Accordingly, this order holds that based on the evidence presented at trial, no rational trier of fact could have found, by a preponderance of the evidence, that the offense depicted in the Instagram photograph took place in the Northern District of California. The government presented no evidence regarding any metadata imbedded in the photograph, which could have revealed information about where and when it was taken. Other than the three items discussed above, the government presented no evidence about Cestoni's ties to the Northern District. The government presented no evidence showing where Cestoni had been on any day other than July 7 at Blondie's Bar. It presented no testimony from any of Cestoni's friends or family who could have testified that he lived in San Francisco. It presented no evidence about where Cestoni regularly hung out, where or if he went to school, where or if he worked, or anything else from which a rational trier of fact could find he lived in San Francisco.

Based on the dearth of evidence establishing venue, Cestoni's Rule 29 motion as to Count One is **GRANTED IN PART**.

The motion is only granted in part because Cestoni seeks an acquittal on Count One. Although neither side briefed this issue, our court of appeals has clearly held than an acquittal is not the proper remedy for a venue defect raised in a post-trial Rule 29 motion:

> In holding that Ruelas-Arreguin preserved his venue objection, we do not suggest that an acquittal is the proper remedy for improper venue. When venue has been improperly laid in a district, the district court should either transfer the case to the correct venue upon the defendant's request, or, in the absence of such a request, dismiss the indictment without prejudice.

*United States v. Ruelas-Arreguin*, 219 F.3d 1056, 1060 n. 1 (9th Cir. 2000) (internal citations omitted). Our court of appeals has further held that "the failure to establish venue does not go to guilt or innocense . . . and so is not shielded by the double jeopardy clause." *United States v. Kaytso*, 868 F.2d 1020, 1021 (9th Cir. 1988). Cestoni has not made a request to transfer the case to a different venue. Accordingly, Count One of the superseding indictment is hereby **DISMISSED WITHOUT PREJUDICE** and the verdict on that count is **VACATED**.

5

In addition to venue, the defense further argues that no rational trier of fact could have found that the offense depicted in the Instagram photograph occurred "on or about" July 4, 2015 (the date charged in the indictment) and also that no rational trier of fact could have found that the object depicted was a firearm, as defined by federal law. This order disagrees. As to the first argument, the defense suggests that the government is required to prove that the offense occurred within "one or two days" of the date charged in the indictment, citing *United States v. McCown*, 711 F.2d 1441, 1450 (9th Cir. 1983). Our court of appeals, however, has subsequently rejected this argument, stating "because the statute does not make time a material element, the variance between proof and indictment is irrelevant so long as the defendants were afforded adequate notice of the charges against them." *United States v. Laykin*, 886 F.2d 1534, 1543 (9th Cir. 1989). Here, there is nothing in the record to suggest that the operative indictment failed to afford Cestoni adequate notice of the charges against him.

As to the second argument, a rational trier of fact could have found beyond a reasonable doubt that the firearm depicted in the Instagram photo was the same firearm recovered on July 7 after the incident at Blondie's Bar. The government displayed to the jury the recovered firearm and placed it next to the Instagram photo, showing the jury the firearm's distinctive marks. Nevertheless, as stated above, this order finds that no rational jury could have found that the government established venue, and thus Count One is dismissed without prejudice.

### 2. RULE 33 MOTION.

Rule 33 provides that a court "may vacate any judgment and grant a new trial if the interest of justice so requires." "A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992).

This order finds that two events, each independent of the other, require that Cestoni's conviction on Count Two be vacated in favor of a new trial. *First*, this order finds that the government withheld exculpatory information from the defense, in violation of Cestoni's Fifth Amendment right to due process and the Supreme Court's ruling in *Brady v. Maryland*, 373 U.S. 83 (1963). There are three elements to a *Brady* violation: "The evidence at issue must be

6

1  [1] favorable to the accused, either because it is exculpatory, or because it is impeaching; [2]
2  that evidence must have been suppressed by the State, either willfully or inadvertently; and [3]
3  prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

4        As stated above, Cestoni's co-defendant, Claudio Maciel, pled guilty to being a felon in
5  possession of the same firearm based on the July 7 incident at Blondie's Bar. (The government
6  theorized that both had joint possession.) After he pled guilty, an order referred him to
7  probation for preparation of a presentence report. In connection with that report, Selena Lennox
8  (Maciel's wife and the person police found with the charged firearm in her purse on the night in
9  question) made statements to the probation officer, which were included in a draft presentence
10 report. Lennox told probation, as quoted in the draft report, "*I was already in possession of the*
11 *gun because of the area we were in*" and that the victim must have been "confused because he
12 ran into [Maciel and Lennox] outside" (Leonida Decl. at ¶¶ 7–8, Exh. B). To be clear, these
13 statements were contained in the draft presentence report — this order does not consider any
14 statements contained in the probation officer's handwritten notes. Probation sent the draft
15 presentence report (which included Lennox's statements) to the government on April 5, 2016,
16 on the evening of the first day of evidence presentation in Cestoni's trial (*id*. at ¶ 6). The next
17 day, April 6, the government called three witnesses and then rested. The defense called no
18 witnesses even though it had Lennox under subpoena (though Lennox was not in the hallway
19 ready to testify). The defense did not know of her statements when it rested.

20       The government informed the defense of Lennox's statements on April 14, three days
21 after the jury verdict (and then only after a court order to do so). Prior to Cestoni's trial, the
22 defense had attempted to interview Lennox, but she had refused to talk about the case for fear of
23 implicating her husband, Maciel (*id*. at ¶ 4; Dominguez Decl. at ¶¶ 2–6).

24       As to the first *Brady* element, Lennox's statements, contained in the draft presentence
25 report, are clearly exculpatory. Our court of appeals has held that "[w]hile a criminal defendant
26 has no constitutional right to examine presentence reports, he is nevertheless entitled to
27 disclosure of *Brady* material contained therein." *United States v. Alvarez*, 358 F.3d 1194, 1207
28 (9th Cir. 2004).

7

1  In Count Two, the government charged Cestoni with possessing a firearm on July 7
2  based on the victim's statement that Cestoni showed the firearm to him outside Blondie's Bar.
3  Lennox's statements in the draft report contradict the victim's story. As set forth in the draft
4  report, Lennox said she "was already in possession of the gun because of the area we were in."
5  One reading of "already in possession" is that Lennox was already in possession of the gun
6  when they arrived at the bar and when the victim confronted one of them on the sidewalk.
7  Furthermore, Lennox's statement, also quoted in the draft report, that the victim must have been
8  "confused because he ran into them outside," suggests that the victim must have been confused
9  when he accused Cestoni of possessing the gun on the sidewalk, because he actually confronted
10 Maciel and Lennox on the sidewalk, not Cestoni. Our court of appeals has clearly held that
11 "[a]ny evidence that would tend to call the government's case into doubt is favorable for *Brady*
12 purposes." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013). Here, Lennox's statements
13 unquestionably tend to call the government's case into doubt.

14  As to the second *Brady* factor, the government suppressed Lennox's statements
15 contained in the draft report. "[T]he fact that the individual prosecutors who brought the case
16 against Amado may not themselves have had the [exculpatory materials] in their possession is
17 not a bar to Amado's *Brady* claim." *Amado v. Gonzalez*, 758 F.3d 1119, 1134 (9th Cir. 2014).
18 Furthermore, "even if the trial attorney did not himself possess the exculpatory evidence,
19 knowledge of that evidence is imputed to him under *Brady*." *Aguilar v. Woodford*, 725 F.3d
20 970, 982 (9th Cir. 2013).

21  As stated above, probation sent Maciel's draft presentence report to the government on
22 the evening of April 5, in the middle of trial. The government presented three witnesses the
23 next day, on April 6. Under our court of appeals' holdings, it is immaterial whether the specific
24 prosecutors in our case had actually read Lennox's exculpatory statements. The "knowledge of
25 that evidence is imputed to [them] under *Brady*." *Ibid*. Moreover, "[t]he prosecutor may have
26 been so busy preparing to wrap up his case that he . . . failed to grasp the significance of the
27 [exculpatory evidence]. But *Brady* has no good faith or inadvertence defense." *Gantt v. Roe*,
28 389 F.3d 908, 912 (9th Cir. 2004). The government had Lennox's statements (in the form of

8

1   the draft report) in its possession before the close of evidence in the trial.  It did not turn the
2   draft report over to the defense.  Accordingly, the exculpatory statements contained in the draft
3   report were suppressed within the meaning of *Brady*.

4   The third *Brady* factor concerns prejudice.  The government's suppression of
5   exculpatory evidence is prejudicial if there is a "reasonable probability" of a different result
6   absent the suppression.  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  A reasonable probability is
7   "a probability sufficient to undermine confidence in the outcome" of the trial.  *United States v.*
8   *Bagley*, 473 U.S. 667, 682 (1985).  "The critical question is whether the suppressed *Brady*
9   material could have provided material evidence that may have changed the result."  *Williams v.*
10  *Ryan*, 623 F.3d 1258, 1266 (9th Cir. 2010).

11  Here, the presentation of Lennox's statements unquestionably "may have changed the
12  result," as they directly undermine the victim's (and the government's) story.  *Ibid*.  The victim
13  identified Cestoni as the man who displayed the firearm, but Lennox's statements indicate that
14  she already had possession of the gun when Cestoni supposedly displayed it.  Furthermore,
15  Lennox said that the victim must have been confused, indicating that he had identified the
16  wrong person.  In fact, Lennox's statements corroborate the defense's version of the events, that
17  it was Maciel, rather than Cestoni, who showed the firearm to the victim on the sidewalk.

18  The government argues that no *Brady* violation occurred.  *First*, the government
19  contends that Lennox's statements were not exculpatory because Lennox did not explicitly say
20  that Cestoni did not possess the gun.  The government also asserts that Lennox's statement that
21  she was "already in possession of the gun" is ambiguous as to time frame, such that this
22  statement does not undermine the government's theory of the case.  This order disagrees.  Our
23  court of appeals has clearly held that the "prosecution must disclose materials that are
24  *potentially* exculpatory."  *United States v. Olsen*, 704 F.3d 1172, 1181 (9th Cir. 2013)
25  (emphasis in original).  Even though both of Lennox's statements, quoted in the draft report, are
26  somewhat ambiguous, they would have raised further doubt, especially given that the victim
27  had already backed off his original identification.
28

9

*Second*, the government asserts it did not suppress Lennox's statements because "the defense was aware from the outset of this case that Lennox was a potential witness" (Opp. at 10). In making this argument, the government relies on our court of appeals' decision in *United States v. Bond*, 552 F.3d 1092 (9th Cir. 2009). There, the government argued that the evidence at issue had not been suppressed "because [defendant] was fully aware of [the witness'] existence and the substance of his likely testimony." *Id*. at 1095. Our court of appeals held that there is no suppression if the "defendant has enough information to be able to ascertain the supposed *Brady* material on his own" and "where a witness is involved the government is not required to make [his] statement known to a defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish." *Id*. at 1095–96 (internal quotation omitted).

*Bond* is distinguishable. As an initial matter, *Bond* determined that "there was no concealment of information at all. There was no material favorable to Bond that the government failed to produce." *Id*. at 1097. Here, in contrast, the information suppressed was clearly favorable to Cestoni. Moreover, as quoted above, *Bond* held that there is no *Brady* violation when a defendant is fully aware of the substance of the likely testimony that the government has not produced. Here, the defense has filed declarations stating that it tried to interview Lennox, but she refused to talk (Dominguez Decl. at ¶¶ 2–6). Thus, in contrast to *Bond*, the defense was not fully aware of the substance of the likely testimony.

The government also relies on a district court decision from the District of Hawaii, *United States v. Tagupa*, No. 13–00553, 2015 WL 6757526 (D. Haw. Nov. 4, 2015) (Judge Michael Seabright). Notwithstanding the fact that *Tagupa* is a non-binding district court decision, it is distinguishable in the same manner as *Bond*. *Tagupa* held that " the government does not commit a *Brady* violation if the defense has meaningful access to the essential facts of the exculpatory evidence." *Id*. at *4. In our case, the defense lacked meaningful access to the exculpatory evidence because Lennox refused to talk to the defense's investigator.

After the briefing had closed on the instant motion, the government filed an unauthorized reply brief responding to the defense's submission. There, the government

10

asserted that it did not suppress Lennox's statements because defense Attorney Ellen Leonida admitted that on the afternoon of April 6 (after all evidence had closed in our case), she had heard from Lennox's counsel that Lennox had made exculpatory statements to probation and that, according to Lennox's counsel, the government might be suppressing potential *Brady* material (Lenoida Decl at ¶ 2). Attorney Leonida attempted to confirm Lennox's statements, but did not have access to the draft presentence report (*id*. at ¶ 3). She did not receive the draft report until April 14, when the prosecution finally turned it over after verdict.

This "revelation," learned by Attorney Leonida through an unconfirmed hearsay statement, did not cleanse the *Brady* violation. Attorney Leonida's declaration did not show that she "la[id] a trap for prosecutors" as the government suggests. *Amado*, 758 F.3d at 1135. Rather, the Leonida declaration revealed that she heard from Lennox's counsel that the government might be suppressing *Brady* material, that she tried (unsuccessfully) to confirm that report, and that she viewed Lennox's quoted statements for the first time when she received the draft report from the government on April 14.

*Third*, the government argues that the defense did not suffer prejudice because Lennox's statements are inadmissible hearsay. Not so. Lennox had personal knowledge of what was in her purse (and when) and counsel could simply have elicited that testimony, using the statements to probation to impeach or to refresh as needed. Even if Lennox refused to testify, the statement to probation would have sailed in as a statement against interest, or under the residual exception, or under the Supreme Court's "ends of justice" exception established in *Chambers v. Mississippi*, 410 U.S. 284, 301–02 (1973).

The Court is disappointed that government counsel have tried so hard to sweep away a clear-cut *Brady* violation rather than confess error. In case after case, our prosecutors have reminded judges on this bench that they are aware of their *Brady* obligations and will honor them (such that motions to enforce *Brady* should be denied). This tawdry episode casts doubt on how much we judges can rely on that theme.

In addition to the *Brady* transgression, the government committed a clear evidentiary violation during trial, which serves as an independent basis on which this order grants Cestoni's

11

Rule 33 motion. On Sunday April 3, one day before trial, the government filed a motion in limine asking for permission to introduce several photos from Cestoni's Instagram account (out of hundreds of photos) to demonstrate to the jury that he had a pattern and practice of posting photos to Instagram shortly after they were taken. The handful of photos presented each happened to have a date visible in them and indeed had been posted to Instagram shortly after the date depicted in the photo. Specifically, the government's motion in limine stated (Dkt. No. 94): "The Instagram photographs in question support the inference that Defendant Cestoni's pattern and practice was to post photographs to his Instagram account soon after the photographs were taken. Therefore, the photographs are highly probative of the question whether the photograph identified in Count 1 of the Superseding Indictment was taken 'on or about' July 4, 2015."

On at least three different occasions, the Court made explicitly clear to the government that if it were going to survey all Instagram photos posted by Cestoni to find those with a date visible in them (in order to prove Cestoni had a pattern and practice of posting photos to Instagram shortly after they were taken), *then the government would have to include in its survey and presentation each and every photo with a date shown therein and not cherry pick the ones with convenient dates*. Specifically, the Court stated as follows:

> THE COURT: . . . The only way I would let you do this would be to have a qualified witness say the following to the jury: I reviewed every single photograph and I studied it carefully, and any time there was some date evident within the picture itself, I put that to one side; and when I got through to the end -- I'm making this part up now -- all seven -- there were only seven in that category, and all of those seven were close in time to when they were posted (April 4 Tr. at 5).

>      *          *          *

> THE COURT: Fine. Now, he better have reviewed every single one of them on there; and when Ms. Leonida busts him, blows him out of the water because she finds one that contradicts, I'm just going to say, you know, good for her. So he better had done a good job.

> THE GOVERNMENT: We understand, Your Honor.

> THE COURT: And he needs to identify the ones -- the longest -- furthest-away date so that the jury can have the benefit of all that

12

> info. And you can use one nonprejudicial illustrative exhibit (April 5 Tr. at 2).
>
> \*         \*         \*
>
> THE COURT: You need to make sure that the witness has reviewed every single item and tell the jury how many there are, because, you know, the fact that it's only seven out of 1200, if that's true, maybe that proves something, but it's a small sample (April 6 Tr. at 4).

On direct examination, the FBI Case Agent testified that he reviewed 333 photos from Cestoni's Instagram account and that eight of these photos had a date visible within the photo. He went through each photo (although only two examples were admitted into evidence) and testified that the longest gap between a date visible in a photo and the date that photo was posted to Instagram was eight days. Specifically, the FBI Agent testified as follows:

> Q. [Asking about the last photo in the series] How much time would there be between the date listed in the photo and the date below?
>
> A. So eight days.
>
> Q. And, [FBI Agent], you testified awhile ago that you -- how many images did you identify where you could see a date in the image itself?
>
> A. Between the two sets of documents, 2014 and 2015?
>
> Q. Correct.
>
> A. Approximately eight.
>
> Q. And is this -- of the ones that you looked at, is [a gap of eight days] the longest distance between the date and the image and the date it was posted?
>
> A. Yes, it was (April 6 Tr. at 107–08).

On cross examination, however, the defense blew this entire analysis out of the water by presenting an Instagram photo with the date October 24, 2012 shown in it, which had been posted to Cestoni's Instagram account on May 25, 2014, a gap of more than 19 months (Defense Exh. HH). This photo appears to have been a memorial to one of defendant's friends, a photo card showing his birth date and death date. On redirect, the FBI Agent explained his knowing omission as follows:

13

Q. Do you remember seeing this photo [with the 19 month gap]?

A. I do.

Q. And is there a reason that you didn't post -- you didn't identify it?

A. So based on information that I previously knew, I knew --

THE COURT: Answer the question.

THE WITNESS: Based on information that I previously knew, I knew this to be a memorial photo versus, like, something that would be more current.

Q. And so does this appear to you to be a photo of another photo?

A. Yes.

Q. And where -- can you tell where the date is, you know, is it in the photo or the photo of the photo?

A. According to this photo, it appears to be a date of August 1993 on the left-hand side and then on the right-hand side of the photo it says October 24th of 2012.

Q. And just so that we're clear, and these appear in -- you testified a minute ago, it appears to be a photo of a photo; is that correct?

A. Yes (April 6 Tr. at 115-16).

The government now acknowledges in its post-trial briefing that this omission constituted an "error" (Dkt. No 133 at 6). Government counsel stated that they were unaware of the omission and now essentially hang the FBI Agent out to dry, blaming the debacle on him.

In its closing argument, however, the government did not admit this error. Rather, in discussing this "picture of a picture" the government accused defense counsel of engaging in "a little sleight of hand" by even referring to it during the FBI Agent's cross examination.

In granting the government's motion to admit the survey of Instagram photographs containing a visible date, the Court relied on the government's assurance that it had and would review each and every photograph and would include all with a visible date, all this to overcome the small size of the sample and to avoid cherry picking. Had the government actually followed the order, and included Exhibit HH in its survey, the probative value of the survey would have been diminished and the survey would not have been allowed into evidence in the first place. Thus, this order rejects the government's argument that defense counsel's

14

presentation of Exhibit HH on cross examination fully cured the error. Furthermore, the government's jury argument that defense counsel had engaged in a "sleight of hand" for pointing out the government's clear mistake was prejudicial (since it has now conceded that the prosecution, not the defense, was in error).

The Court recognizes that granting a new trial in a criminal case under Rule 33 is a rare occurrence. In seventeen years on the bench, the undersigned judge has never granted a new trial following a guilty verdict under Rule 33. This case, however, has proven to be exceptional. Based on a close review of the evidentiary record (an evidentiary record thin to begin with), and based on the interest of justice, this order finds that the government's *Brady* violation warrants the grant of a new trial. Furthermore, the government's clear contravention of the Court's order regarding the Instagram photographs, and its disparaging remark towards defense counsel during closing argument, serve as a separate and independent basis warranting the grant of a new trial. Accordingly, to the extent stated herein, Cestoni's Rule 33 motion as to Count Two is **GRANTED**.

## CONCLUSION

To the extent stated herein, Enzo Cestoni's Rule 29 motion as to Count One is **GRANTED IN PART**. The verdict on Count One is hereby **VACATED** and Count One is **DISMISSED WITHOUT PREJUDICE** for improper venue. To the extent stated herein, Cestoni's Rule 33 motion as to Count Two is **GRANTED IN FULL**. The verdict on Count Two is hereby **VACATED**. The parties shall appear for a status conference at **TWO P.M. ON JUNE 7, 2016**.

**IT IS SO ORDERED.**

Dated: May 11, 2016.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

15